[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAR 15 2001
THOMAS K. KAHN
CLERK

No. 97-2618

D.C. Docket No. 95-00089-CR-T-24-C

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SIGMA INTERNATIONAL, INC.,
d.b.a. SIGMA U.S.A., INC.,
CHARLES STERNISHA, et al.,

Defendants-Appellants.

Appeals from the United States District Court
for the Middle District of Florida

**PETITIONS FOR REHEARING**
(Opinion November 30, 1999, 196 F.3d 1314)

Before TJOFLAT, BIRCH and BRIGHT*, Circuit Judges.

_____
*Honorable Myron H. Bright, U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

TJOFLAT, Circuit Judge:

## I.

## A.

Sigma International, Inc. ("Sigma") is a seafood company that purchases frozen shrimp from overseas companies, including companies in India and China. The companies from which Sigma purchases the shrimp either process and pack the shrimp themselves or contract with another company to process and pack the shrimp. Sigma then imports the frozen shrimp into the United States.[1]

The United States Food and Drug Administration ("FDA") is charged with inspecting imported food to determine whether the food meets FDA standards. When food is shipped to the United States, the importing company must provide documents ("import documents") to the FDA that identify the nature of the shipment (i.e., the type of food), the country of origin, and the name of the company that packed the food.[2] The United States Customs Service ("Customs")

---

[1] Sigma has a processing plant in St. Petersburg, Florida. At the time of the events giving rise to the indictment in this case, William Andrew Walton was the vice-president and manager of Sigma's international division, also located in St. Petersburg. Charles Sternisha was the manager of the St. Petersburg plant. Sigma, Walton, and Sternisha, the appellants in this case, raise mainly the same points on appeal; we therefore refer to them jointly as "Sigma." When discussing Walton and Sternisha individually, however, we refer to them by their individual names.

[2] At the time the events of this case transpired, importers had to fill out two documents – Customs form 3461 and FDA form 701. Both of these forms requested essentially the same information: origin of shipment; nature of shipment; name of importing company; name of

assists the FDA by detaining the shipment until the FDA has given the importer a notice that it may proceed, known interchangeably as a "green ticket" or "may proceed notice." The shipment is then released.

After the FDA receives the import documents, it makes a decision, based on the information in the documents, to do one of three things: (1) automatically detain the shipment when it arrives in the United States, (2) conduct a random sampling of the shipment upon arrival, or (3) take no action and issue a "green ticket."

If shipments of certain food products from a particular country fall short of FDA standards on a consistent basis, then the type of food, e.g., shrimp, and the country of origin, e.g., India, are placed together on the FDA's "Import Alert list." When shipments are identified by the import documents as an Import Alert item, e.g., "Indian shrimp," the FDA automatically detains the shipment and places it in a storage facility at the importer's expense. The shipment remains at the storage

shipping company; and name of packer/processor of food. The importer had to attach to these forms the commercial invoice (between the importer and exporter). Additionally, the importer often included (though not required by the FDA) a certificate of origin, a certificate of insurance, and a certificate of health from the exporting country (indicating that the food was fit for human consumption before it was exported).

Importers themselves did not present these documents to Customs and the FDA. Rather, they submitted the documents through customhouse brokers. The importer would give the broker a packet of information that contained the invoice and any certificates. The broker then prepared forms 3461 and 701 and brought them with the certificates and invoices to Customs at the port of entry. This was usually done before the shipment actually arrived in the United States.

facility until tests conducted by the importer indicate that the food meets FDA standards.

Some companies that package and process foods on the Import Alert list (such as Indian shrimp) have a history of compliance with FDA standards. These companies are placed on an "exempt" or "A" list,[3] and their status as preferred packers relieves the FDA's need to detain the food for testing. In other words, foods on the Import Alert list, if they are processed and packaged by an "A" list company, may enter the United States without being automatically detained.

A product not on the Import Alert list (and therefore not subject to automatic detention) may nonetheless be subjected to random sampling. If the FDA decides to sample a shipment, it collects and tests the sample at its own expense. If the product passes the test, it receives a green ticket and Customs releases the shipment. If the FDA determines that neither automatic detention nor random sampling is warranted for a given shipment, the shipment is given a green ticket and allowed to proceed immediately.

---

[3] The "exempt" list of packer/processors is sometimes referred to as the "A" list because when the FDA issues an Import Alert for a certain product, it also issues an Appendix A. This appendix includes the names of exempt packer/processors. From time to time, the FDA will issue notices to its branch offices and Customs indicating the names of packer/processors that have either been added to or removed from the list.

1.

In late 1991, the FDA issued an Import Alert for Indian shrimp.  Thus, all shrimp imported from India, except shrimp processed and packed by "A" list companies, was automatically detained for testing upon entering the United States.

Bliss Impex, a processor and packer of Indian shrimp, was on the "A" list until December 16, 1991.  Sigma purchased shrimp from Bliss Impex both before and after it was removed from the "A" list.  Between December 1991 and January 1992, Sigma purchased the following quantities of shrimp from Bliss Impex to be shipped to Tampa, Florida: 701 cartons, 267 cartons, 450 cartons, and 100 cartons.  By the time the shipments of shrimp arrived in the United States, Sigma knew that Customs would automatically detain them because Indian shrimp was on the FDA Import Alert list and Bliss Impex was no longer an "A" list company.[4]

In February 1992, Sigma attempted to avoid automatic detention by directing its customhouse broker in Tampa to return the import documents without presenting them to Customs or the FDA.[5]  Later that month, Sigma provided the

_____

[4] Sigma was alerted to the automatic detention because a shipment that it had purchased from Bliss Impex to be shipped to Miami was automatically detained on January 31, 1992.  The packages of frozen shrimp that Sigma purchased to be shipped to Tampa, described in the text above, had not yet arrived in Tampa by that date.

[5] The system worked like this: Typically, Sigma employee Paul Fulford would give Marisa Butera (an employee of the customhouse broker, Copeland Co.) the necessary documents for an incoming shipment (i.e., invoices, bills of lading, and certificates of insurance, origin, and health).  Butera would use the information contained in these documents to prepare the Customs

customhouse broker with falsified invoices that listed Silver Star – an "A" list company – rather than Bliss Impex, as the packer.[6]

Later in 1992, Sigma purchased and had shipped two more packages of shrimp from Bliss Impex – one of 525 cartons, and one of 393 cartons. These packages were packed and processed by "Coral Sea Foods," an "A" list packer at the time of the purchase. After the shipments left India, Coral Sea Foods was removed from the "A" list. Not wanting to have the shipments detained, Sigma had the invoice documents altered again to indicate that Silver Star had packed the shrimp. When the shipments arrived in the United States, Sigma had its employees strip off the Coral Sea Foods labels on the cartons and replace them with labels that read "packaged for Sigma International."

Pursuant to its discretionary authority, the FDA decided to conduct a random sampling of the 525-carton shipment instead of immediately giving it a green ticket and allowing it to proceed. While an FDA inspector was conducting the random

---

3461 and FDA 701 forms. At appellants' trial, Butera testified that several times Fulford called her after having sent her the documents and requested that she not submit them to Customs or the FDA, but return them to Sigma instead. Fulford explained that Sigma had decided to have the shipment arrive in Miami instead of Tampa, so he needed the forms back. After Butera returned the forms, she sometimes got them back from Fulford with a note that Sigma had decided to have the shipment arrive in Tampa after all. She never compared the documents to realize that the name of the packer/processor had been changed.

[6] Silver Star was removed from the "A" list in 1994.

sampling of the shipment at Sigma's plant,[7] she noticed that 348 of the 350 boxes she inspected had the label torn off. The remaining two boxes were labeled "Coral Sea Food," and the other 348 had a new label, "packaged for Sigma, International."

As a result of the suspicious labeling, the FDA began an investigation of Sigma's practices relating to the importation of Indian shrimp. During its investigation, the FDA searched Sigma's offices and its St. Petersburg plant and observed large quantities of shrimp, which had been imported from China, soaking in a chlorine wash. This discovery heightened the FDA's concern about Sigma's handling of imported shrimp, and the agency broadened its investigation.

2.

In late 1994 and early 1995, several of Sigma's customers began rejecting the frozen shrimp Sigma was sending them, claiming that the shrimp was decomposing.[8] Rather than dispose of the shrimp, Sigma decided to test everything its customers returned. Sigma sorted the returned shrimp into a 5000

---

[7] A food shipment that arrives in the United States but which has not yet received a green ticket may be held by the importing company in its storage under bond with the FDA. This is presumably why the 525 cartons were at Sigma's plant during the random sampling.

[8] The shrimp in these instances came primarily from China.

series, representing shrimp that was acceptable to resell in its current condition, and a 6000 series, representing shrimp that appeared to be unacceptable but might be salvageable if washed. To determine whether any of the 6000 series shrimp could be saved, Sigma partially thawed the shrimp and tested it organoleptically for decomposition, by smelling and feeling the shrimp. Then, Sigma "washed" the 6000 series shrimp by soaking it in Sea Fresh, a mixture of water, copper sulfate, chlorine, and lemon juice. If, after the "washing," any of the shrimp passed a new organoleptical test, Sigma renumbered the shrimp in a 7000 series, refroze it, and resold it to other customers. If, after the "washing," the shrimp failed the second organoleptical test, Sigma renumbered the shrimp in a 8000 series and stored it in its plant.

## B.

In the fall of 1994, Sigma's method of importing frozen shrimp from India and its processing of frozen shrimp from China became the subjects of a grand jury investigation in the Middle District of Florida. In all, three separate grand juries considered the case. The first grand jury was empaneled on May 20, 1992, and two years later, in April 1994, returned an indictment against Yaw-Bin Huang, the president of Sigma (the "Huang indictment"). The Huang indictment, which was

8

filed under seal, charged Huang with the same offenses alleged in the superseding indictment now before us. Huang fled the United States prior to his indictment and has not been apprehended.

With the indictment against Huang lying dormant, the case was presented to a second grand jury, which was empaneled on September 8, 1994, and discharged on September 6, 1995. The second grand jury conducted an extensive investigation into Sigma's affairs; it heard the testimony of scores of witnesses and considered hundreds of documents. The targets of the investigation were, in addition to Huang, the appellants, Sigma, William Walton, and Charles Sternisha, and Jagadeesh Reddy, Robert Fields, and Geogy Kannikal.

By the time it was discharged on September 6, 1995, the second grand jury had spent considerable time entertaining all of the testimony and documentary evidence the Government presented. The second grand jury did not return an indictment (that would supersede the Huang indictment). Instead, on September 6, the second grand jury was discharged. The same day, the third grand jury was empaneled. On September 13, Assistant United States Attorney ("AUSA") Michael Rubinstein introduced the third grand jury to the case and said that he expected it to return an indictment (that would supersede the Huang indictment)

9

the next day.[9]  The grand jury acceded to his request and returned the instant

superseding indictment (the "indictment") on September 14.

The indictment contained twelve counts.  Counts One through Four involved

the Indian shrimp; Counts Five through Twelve involved the Chinese shrimp.

Count One charged all of the defendants[10] with conspiring to defraud the FDA and

Customs by altering importation documents and conspiring to introduce

adulterated shrimp into interstate commerce, in violation of 18 U.S.C. § 371.

Counts Two and Three charged the defendants with two instances of knowingly

and wilfully introducing imported goods by means of false statements in violation

of 18 U.S.C. §§ 542 and 2.[11]  Count Four charged the defendants with obstructing

justice in violation of 18 U.S.C. § 1505 by attempting to obtain false testimony

---

[9] The record indicates that AUSA Michael Rubinstein and AUSA Dennis Moore inherited the case from two AUSAs who left the United States Attorney's Office in the middle of the investigation.  Rubinstein presented the case to the second grand jury, which took no action, and to the third grand jury, which returned the instant indictment.  Rubinstein, Moore, and AUSA Robert Monk, their supervisor, signed the indictment.  AUSAs Tamara Phipps and David Rhodes have represented the Government in this appeal.

[10] The defendants charged in the indictment were Sigma International, Inc., Yaw-Bin Huang, the president and owner of Sigma, William Walton, vice-president and manager of Sigma's international division, Charles Sternisha, Sigma's plant manager in St. Petersburg, Jagadeesh Reddy, employed by Sigma in the procurement of imported products, Robert Fields, Sigma's principal salesman in the international division, and Geogy Kannikal, Sigma's purchasing agent in India.

[11] Counts Two and Three charged all defendants except Sternisha, Reddy, and Fields.

from, among others, the principals of Silver Star Sea Foods and Bliss Impex.[12]

Counts Five through Eight charged the defendants with four instances of adulterating Chinese shrimp in violation of 21 U.S.C. §§ 331(k) and 333(a)(2) and 18 U.S.C. § 2.[13]  Counts Nine through Twelve charged the defendants with four instances of introducing adulterated Chinese shrimp into interstate commerce, in violation of 21 U.S.C. §§ 331(a) and 333(a)(2) and 18 U.S.C. § 2.[14]

## C.

### 1.

Trial was originally set for April 1, 1996.[15]  On December 12, 1995, Sigma moved the district court to examine in camera the transcript of the proceedings before the third grand jury.   In its motion and supporting memorandum, Sigma represented "that [a]pproximately three weeks from [the] conclusion [of the Government's investigation, around August 25, 1995,] and the return of the

---

[12] Count Four charged all defendants except Huang, Sternisha, Reddy, and Fields.

[13] Counts Five through Eight charged all defendants except Kannikal.

[14] Counts Nine through Twelve charged all defendants except Kannikal.

[15] After the initial indictment was returned, the case was assigned to United States District Judge Susan C. Bucklew.  She presided over the case at all times thereafter – through the return of the superseding indictment, the trial, and sentencing.  The case did not actually go to trial until August 13, 1996.

11

Superseding Indictment [on September 14], the Government switched grand juries abruptly." Sigma further represented that the Government switched grand juries notwithstanding the fact that the earlier (second) grand jury had heard all of the witnesses and examined all of the documentary and physical evidence the FDA and Customs agents had assembled, and that the successor (third) grand jury would have had insufficient time to consider the case. Although Sigma's motion did not accuse the three AUSAs who had signed the indictment of improper conduct, it suggested that something highly inappropriate had occurred, to-wit: the second grand jury had refused to indict, so the Government let its term expire and had the district court empanel a new (third) grand jury to consider the case.

On January 8, 1996, the Government filed a response to Sigma's December 12 motion. The response consisted, in the main, of Rubinstein's recital of what had transpired before the third grand jury and concluded that "no improprieties occurred."[16] Rubinstein represented to the district court that, during the third grand jury proceeding, he had the case agents summarize the testimony and other evidence that had been presented to the second grand jury. He represented, in

---

[16] Rubinstein served as the Government's lead counsel throughout the proceedings in the district court. In that capacity, Rubinstein signed the Government's response to Sigma's December 12, 1995 motion for an in camera examination of the transcript of the proceedings before the third grand jury and the Government's responses to Sigma's subsequent motions to dismiss the indictment.

12

addition, that he informed the grand jury that "the full transcripts [of such testimony], and [the] documentary evidence [were] continuously available in the jury room, and [that he] urged the jurors to read such transcripts." Finally, he said that he repeatedly emphasized to the third grand jury that they had a right to summon the witnesses and hear them testify.

The district court referred Sigma's motion to a magistrate judge; she heard the motion on February 15, 1996. At the conclusion of the hearing, she took the motion under advisement. On March 15, 1996, relying on Rubinstein's representations as to the manner in which the case had been presented to the third grand jury (including that Rubinstein had urged the grand jurors to review the transcripts that he had made continuously available to them in the jury room), and without reviewing the transcripts of the grand jury's proceedings, the magistrate judge denied the motion in a written order. She thus did not review the transcripts in camera.

2.

The trial began on August 13, 1996. On September 4, during the Government's case in chief, FDA Agent Robert Siberski, who had testified before the second and third grand juries, took the stand. Pursuant to the Jencks Act, 18

U.S.C. § 3500,[17] Rubinstein gave Sigma transcripts of the exculpatory portions of Siberski's grand jury testimony.[18] On September 5, after reviewing these transcripts, Sigma moved the district court to dismiss the indictment on the ground that improper prosecutorial conduct occurred before the grand jury.[19] Sigma contended that the transcripts demonstrated "exactly the concern that prompted the earlier [motion]" for in camera review: specifically, before the third grand jury, Rubinstein had testified, argued, and wrongfully answered questions from the grand jurors. Sigma requested initially that the court order the disclosure of those portions of Siberski's testimony that had been redacted from the transcripts Rubinstein had turned over.

On September 10, Rubinstein filed the Government's response to Sigma's motion. In it, he once again represented that nothing he did or said before the

---

[17] Section 3500 states, in pertinent part:
(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.
. . . .
  (e) The term "statement", as used in subsection[] (b) . . . means –
. . . .
    (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

[18] The record is unclear as to exactly when, prior to September 5, 1996, Rubinstein gave the defendants these portions of Siberski's grand jury testimony.

[19] Sigma attached the transcripts of Siberski's testimony as an exhibit to the motion.

14

grand jury could be considered inappropriate.  Rubinstein said that presenting a

case to a grand jury as he did – by summarizing testimony and documentary

evidence considered by a previous grand jury – is acceptable.  As for informing the

grand jurors of his opinions, he argued that a prosecutor may state his or her own

opinions as long as the grand jury is aware that the "opinion is based on the

evidence, and [that it is] free to evaluate the evidence as it sees fit."  Rubinstein

argued, alternatively, that, under the Supreme Court's decision in United States v.

Mechanik, 475 U.S. 66, 106 S. Ct. 938, 89 L. Ed. 2d 50 (1986), the district court

should defer ruling on Sigma's motion until the conclusion of Sigma's trial, when

the jury returned its verdict, because "[a] verdict of guilty or not guilty will render

moot any issues of evidentiary insufficiency or violation of the [Federal Rules of

Criminal Procedure]."  Rubinstein's alternative argument apparently impressed the

court, because it did not address Sigma's motion on the record until long after

Sigma's trial had concluded and the defendant's sentencing hearing had been

scheduled.[20]  On September 11, while the court was presumably considering

Sigma's motion and the Government's response, Rubinstein informed the court (in

---

[20] That the district court decided to defer its disposition of Sigma's motion to dismiss until after the jury had returned its verdict at trial is mentioned nowhere in the record until April 21, 1997, when the court entered the written order described infra Part I.D.2.  In that order, the court stated that, at the time Sigma made its motion, it decided to postpone its disposition of the motion until the trial had ended.

the absence of the jury) that he had filed under seal the complete transcript of the proceedings before the third grand jury.

On September 23, Sigma renewed its motion to dismiss the indictment, contending, as before, that Rubinstein had engaged in improper conduct before the grand jury. As evidence of such conduct, Sigma cited to the heavily-redacted transcript of FDA Agent Rande Matteson's testimony before the third grand jury, which Rubinstein had turned over pursuant to the Jencks Act (because he intended to call Matteson as a prosecution witness).[21] The transcripts, according to Sigma, revealed that Rubinstein "again appeare[d] to be testifying" as an unsworn witness, and, Sigma suggested, the redacted portions of the Matteson transcript would disclose additional unsworn testimony. If the court was not disposed to dismiss the indictment, Sigma asked that it release the transcripts of the entire grand jury proceedings which Rubinstein had filed under seal.

The Government did not file a response to Sigma's renewed motion and, once again, the court gave no indication as to when it would dispose of the motion.[22]

---

[21] Sigma attached the transcripts of Matteson's testimony as an exhibit to the motion.

[22] The court denied the motion on April 21, 1997. See supra note 20.

16

On September 27, the district court clerk, at the court's direction, sent Sigma a list of the dates of empanelment and discharge of the three grand juries that had considered the case. On the basis of this information, Sigma, on September 30, after the Government had rested its case in chief, filed a "Further Update to Motion to Dismiss Concerning Grand Jury Practices." In this pleading, Sigma noted that the second grand jury, which had received the bulk of the evidence in the case, was allowed to expire at the end of a year instead of being "extended the typical six months." Sigma represented that this was "inconsistent with regular practice." Sigma then pointed to the speed with which the third grand jury indicted Sigma and to the partial transcripts which contained "pages of unsworn testimony by the prosecutor and most likely other improper practices," contending that this demonstrated that misconduct had occurred before the grand jury. The Government did not respond to Sigma's pleading, and the court made no ruling.[23]

D.

1.

---

[23] We assume that the district court considered Sigma's September 30 pleading prior to entering its April 21, 1997 order, disposing of Sigma's motions to dismiss the indictment. See supra note 20 and Part I.D.2.

17

On October 18, 1996, after ten weeks of trial, the jury returned the following verdicts: Sigma and Walton guilty on all twelve counts of the indictment; Sternisha guilty of Counts One and Five through Eight, but not guilty on Counts Nine through Twelve; Fields (who is not an appellant here) guilty on Counts Nine through Twelve, but not guilty on Count One; Jagadeesh Reddy not guilty.

Sigma was sentenced to sixty months' probation along with fines and restitution in excess of $1.4 million. Walton was sentenced to concurrent prison terms of forty-one months on Counts One and Four, twenty-four months on Counts Two and Three, and thirty-six months on Counts Five through Twelve to be followed by twenty-four months' supervised release. Sternisha was sentenced to twenty-seven months' imprisonment and two-years' supervised release.

## 2.

On April 21, 1997, the district court entered an order denying Sigma's motions to dismiss the indictment. The court based its decision on two alternative grounds. First, agreeing with the Government, the court held that, under United States v. Mechanik, "[a] petit jury's guilty verdict renders harmless any error in the grand jury's charging decision that may flow from violations before the grand jury." Thus, because the petit jury had found the defendants (with the exception of

18

Reddy) guilty, any prosecutorial misconduct that may have occurred was harmless.

The court held alternatively that Rubinstein's conduct did not unfairly prejudice the grand jury's deliberations and therefore did not render the indictment a nullity. Stating that "[t]he prosecutor offered a reasonable explanation" for the dismissal of the second grand jury, the immediate empanelment of the third grand jury, and its return of the indictment after considering the case for two days, the court found nothing suspicious. In particular, there was nothing suspicious about Rubinstein's failure to present the indictment to the second grand jury because "[t]he decision was made not to seek an indictment until after the deposition of an important witness in India, P.P. Makkar." Although the second grand jury's term could have been extended so that it could vote on the indictment after Makkar's deposition was taken, the court found nothing unusual about Rubinstein's decision not to ask for an extension.

The court made short shrift of two of Sigma's claims that Rubinstein's conduct before the third grand jury had undermined its independence – specifically, (1) that Rubinstein, acting as an unsworn witness, had summarized the evidence presented to the second grand jury, and (2) that he had pressured the grand jury to return the indictment (that he was presenting) in less than two days.

Addressing the first point, the court found Rubinstein's summary of the evidence insignificant, especially in light of the fact that he had the case agents testify in person and answer any questions the grand jurors may have had. The court disposed of Sigma's second point by noting that Rubinstein told the grand jury that, if they needed more information, he would produce it – the inference being that voting on the indictment could be deferred.

3.

Sigma, Walton, and Sternisha appeal their convictions. They contend that their convictions should be set aside and the indictment dismissed on the ground that prosecutorial misconduct undermined the independence of the grand jury and thus rendered the indictment a nullity. Alternatively, they ask for a new trial based on errors that occurred during their trial.[24] Walton and Sternisha also challenge

---

[24] The appellants contend that (1) the district court abused its discretion when it allowed Rubinstein, over repeated objection, to ask leading questions on his direct-examination of prosecution witnesses; (2) the district court should have disqualified Rubinstein as the Government's attorney because he seized and read the defendants' privileged communications with their attorneys and defense counsel's work product; (3) the district court abused its discretion when it admitted police reports into evidence, over defense objection; (4) the district court abused its discretion when it sustained the Government's objection to certain defense exhibits; (5) portions of the jury instructions concerning the regulatory status of chlorine were erroneous; and (6) the district court abused its discretion by permitting the prosecutor to intrude into Sternisha's right to remain silent by questioning Sternisha on cross-examination about whether he revealed to the FDA, following his arrest, that the formula for the wash the FDA had obtained was not the correct formula.

their sentences, contending that the district court misapplied the Sentencing Guidelines. The court did so, they say, by miscalculating the amount of the loss attributable to their conduct; this error, in turn, yielded a higher Guideline sentence range and more severe sentences than a correct loss calculation would have supported.

## II.

### A.

In briefing their first ground for reversal – whether the district court should have dismissed the indictment – Sigma did not have access to the transcripts of the proceedings before the third grand jury. All that Sigma had were the redacted transcripts that Rubinstein had turned over at trial pursuant to the Jencks Act.[25]

When we examined the record on appeal we noticed that, contrary to what Rubinstein told the district court during the trial (on September 11, 1996), the Government never did file the complete transcript of the grand jury proceedings. The complete transcript was still in the possession of the United States Attorney's office. We therefore instructed the United States Attorney to file under seal with

---

[25] The Jencks Act requirement is described supra note 17.

the clerk of this court all of the transcripts of the proceedings before the third grand jury.

After these transcripts were filed, we did not make them available to the appellants and request supplemental briefing. Rather, we proceeded to decide their first ground for reversal on the cold record. Having done so, we concluded that, although Rubinstein's conduct before the third grand jury was "unacceptable" (in that he rushed the grand jury to do something in less than two days that the second grand jury had not done after one year of extensive investigation) such conduct had not undermined the independence of the grand jury. United States v. Sigma Int'l, Inc., 196 F.3d 1314 (11th Cir. 1999). Turning to the appellants' claims of trial court error, we found no basis for overturning the jury's verdicts and ordering a new trial. Id. at 1320. We concluded, however, that the court had erred in fashioning the sentences of Walton and Sternisha and we therefore remanded their cases for resentencing.[26] Id. at 1324-26.

Following the issuance of our opinion, both sides petitioned for rehearing. The Government contends that the panel opinion improperly prescribes standards

_____

[26] We directed that these appellants be resentenced because the district court had included in its loss calculation Chinese shrimp that was "washed" after February 23, 1995. The court erred in doing so because the "washing" that occurred after that date was not illegal. Rather, it had been done without chlorine and under the supervision of the State of Florida. Sigma, 196 F.3d at 1325. The Government did not challenge this holding it its petition for rehearing.

22

of prosecutorial conduct in grand jury proceedings in violation of the Supreme

Court's decision in United States v. Williams, 504 U.S. 36, 112 S. Ct. 1735, 118 L.

Ed. 2d 352 (1992). In addition, the Government characterizes our treatment of

Rubinstein as "unfair." Sigma and the other appellants claim that Rubinstein so

overbore the grand jury that he "substantially interfered with its charging

decision." They assert that we should therefore direct the district court to vacate

their convictions and sentences and dismiss the indictment. Given these opposing

positions, we directed the clerk to unseal the complete transcripts the United States

Attorney had filed and send copies thereof to the parties. We then directed the

parties to file supplemental memoranda on three issues, all bearing on the question

of whether the district court should have dismissed the indictment.[27]

---

[27] Specifically, we granted rehearing on the following issues:
> (a) The deference, if any, this court should give the district court's order of April 21, 1997, denying appellants' motion to dismiss the indictment, . . . to the extent that
>> (i) the order was based on the Supreme Court's decision in United States v. Mechanik, 475 U.S. 66, 106 S. Ct. 938, 89 L. Ed. 50 (1986), and did not mention the Supreme Court's decision in Bank of Nova Scotia v. United States, 487 U.S. 255, 108 S. Ct. 2369, 101 L. Ed. 2d 228 (1988), or this court's decision in United States v. Kramer, 864 F.2d 99 (11th Cir. 1988), and
>> (ii) the order may have been based on the incomplete transcript of the proceedings before the grand jury . . . .
> (b) Whether the conduct of the prosecutor deprived one or more of the appellants of the Fifth Amendment right to "a presentment or indictment of a Grand Jury." U.S. Const. amend. V.

Having the benefit of counsel's submissions, we now address the question whether the district court abused its discretion in denying Sigma's motions to dismiss the indictment.[28]  In doing so, we focus initially on what was before the district court at the time it issued its dispositive order on April 21, 1997.

B.

We review a denial of a motion to dismiss an indictment under the abuse of discretion standard.  United States v. Pielago, 135 F.3d 703, 707 (11th Cir. 1998).  A district court abuses its discretion if, in deciding the issue, it applies the wrong legal standard, Delta Air Lines, Inc. v. ALPA, Int'l, 238 F.3d 1300, 1308 (11th Cir. 2001), or makes findings of fact that are clearly erroneous, In re: Celotex Corp., 227 F.3d 1336, 1338 (11th Cir. 2000).

At the time the district court ruled on Sigma's motions to dismiss the indictment, the court had available to it the redacted transcripts that Rubinstein gave defense counsel as Jencks Act material and the (as we now know) incomplete

---

[28]  In determining whether the district court should have dismissed the indictment, we treat Sigma's motions collectively, as the district court obviously did, rather than seriatim.  That is, we do not determine first whether the court abused its discretion in denying Sigma's pretrial motion for an in camera inspection of the transcripts of the grand jury proceedings and then, separately, the successive motions or pleadings Sigma filed during the course of the trial in its effort to obtain the dismissal of the indictment.  In its April 21, 1997 order, the court had all of Sigma's pleadings  and the Government's responses before it and determined whether Sigma had established a basis for dismissing the indictment.

transcripts that Rubinstein had filed under seal with the court on September 11, 1996. The court also had the benefit of the three briefs filed in support of Sigma's four motions and the Government's responses to Sigma's motion for in camera review and first motion to dismiss the indictment.


1.

In determining whether the district court abused its discretion, we note, as discussed in Part I.D.2, supra, that the court relied on two alternative grounds to deny Sigma's motions to dismiss the indictment. If either ground is sustainable, we must affirm the district court.

The district court first held that the petit jury's verdicts rendered the alleged misconduct before the third grand jury moot under the Supreme Court's decision in United States v. Mechanik, 475 U.S. 66, 106 S. Ct. 938, 89 L. Ed. 2d 50 (1986). The Government maintains that Mechanik controls this case and that the district court properly applied it. We disagree.

The Government contends that Mechanik stands for the proposition that any error in the grand jury proceedings, regardless of its effect upon the grand jury's decision to indict, is rendered harmless by a petit jury's subsequent guilty verdict. In Mechanik, two government witnesses testified in tandem before the grand jury

25

in violation of Fed. R. Crim. P. 6(d), which limits who may be present in the grand jury room while the grand jury is in session. The Court held that any such violation was nonetheless rendered harmless when the defendant was found guilty at trial.[29] Mechanik, 475 U.S. at 73, 106 S. Ct. at 943. The rule thus set forth in Mechanik – that a guilty verdict renders harmless any error before the grand jury – is based upon the limited role of the grand jury, which is to find whether there is probable cause to believe that the defendant committed a crime. If a petit jury later finds the same defendant guilty of the crime beyond a reasonable doubt, logic dictates that the lesser standard of probable cause has obviously been met. See id.

In a concurrence, Justice O'Connor took issue with the focus of the majority's harmless error analysis. Id. at 73-79, 106 S. Ct. at 943-946 (O'Connor, J., concurring). She argued that the harmless error inquiry should not hinge upon what transpired at trial, but upon whether the error committed before the grand jury substantially influenced its decision to indict. Id. at 76-77, 106 S. Ct. at 944 (O'Connor, J., concurring). If the error may be said to have substantially influenced the grand jury, Justice O'Connor believed that the indictment should be

---

[29] To be sure, Mechanik does contain dicta implying that this rule applies to all violations before the grand jury. Specifically, it states that a petit jury's guilty verdict renders harmless "any error in the grand jury proceeding connected with the charging decision . . . beyond a reasonable doubt." Mechanik, 475 U.S. at 70, 106 S. Ct. at 942.

26

dismissed notwithstanding a guilty verdict at trial.  Id. at 78, 106 S. Ct. at 945 (O'Connor, J., concurring).

Two years after Mechanik was decided, the Court, in Bank of Nova Scotia v. United States, 487 U.S. 250, 256, 108 S. Ct. 2369, 2374, 101 L. Ed. 2d 228 (1988), adopted Justice O'Connor's reasoning.  In determining whether an indictment should be dismissed for Rule 6(d) and (e)[30] violations, the Court held that the proper inquiry is whether the error before the grand jury "'substantially influenced the grand jury's decision to indict' or [whether] there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations."[31]  Id. (quoting Mechanik, 475 U.S. at 78, 106 S. Ct. at 945-46 (O'Connor, J. Concurring)).  Thus, Bank of Nova Scotia redirected the harmless error analysis to the grand jury proceedings themselves rather than the outcome of the trial.

Although Bank of Nova Scotia did not explicitly overrule Mechanik, we query what, if anything, remains of the Mechanik rule.[32]  We need not answer the question, however, for we believe that Bank of Nova Scotia clearly controls the

_____

[30] Fed. R. Crim. P. 6(e) governs the secrecy of grand jury proceedings.

[31] We discuss the proper application of this disjunctive test infra note 47.

[32] The only proposition for which Bank of Nova Scotia cites the majority in Mechanik is that the defendant must show prejudice as a result of the violation.  Bank of Nova Scotia, 487 U.S. at 255, 108 S. Ct. at 2374.  Bank of Nova Scotia adopts this proposition, but modifies the remainder of Mechanik's holding by changing the stage at which the court looks for prejudice.

instant case.  We therefore hold that when a defendant raises a constitutional

objection to an indictment prior to the conclusion of trial, the rule set forth in Bank

of Nova Scotia is the applicable law.[33]  Under those circumstances, the court

should review the grand jury proceedings to determine whether the alleged

constitutional error "substantially influenced the decision to indict," or at least

casts "grave doubt" upon the independence of the grand jury's decision, regardless

of a subsequent guilty verdict.[34]  Id.

The district court's April 21, 1997 order denying Sigma's motions to dismiss

the indictment relied first upon Mechanik.  The court held that, under Mechanik,

"[a] petit jury's guilty verdict renders harmless any error in the grand jury's

charging decision that may flow from violations before the grand jury."  Thus, the

---

[33] We note that neither Bank of Nova Scotia nor Mechanik considered constitutional errors.  The alleged violations in both cases involved the Federal Rules of Criminal Procedure.  We see no reason, however, why Bank of Nova Scotia's analysis with respect to a procedural rule would be less applicable to constitutional challenges.

[34] Neither Mechanik nor Bank of Nova Scotia discussed Fed. R. Crim. P. 12.  Rule 12(b) provides that any defense or objection "which is capable of determination without the trial of the general issue may be raised before trial by motion."  The motions to dismiss the indictments in Mechanik and Bank of Nova Scotia were certainly capable of such determination.  Rule 12(b) further specifies that "(1) [d]efenses and objections based on defects in the institution of the prosecution; or (2) [d]efenses or objections based on defects in the indictment or information" must be raised prior to trial.  If a motion must be made under Rule 12(b) prior to trial but is not, it is deemed waived under Rule 12(f), "but the court for cause shown may grant relief from the waiver." Fed. R. Crim. P. 12(f).  The motions to dismiss the indictments in Mechanik and Bank of Nova Scotia were made after the trials began. Thus, we infer from the Court's silence on the issue of waiver (or relief therefrom) that the Court does not classify such motions to dismiss the indictment as defenses or objections that must be raised prior to trial.  Rather, the motions apparently fall into the category of defenses and objections that may be raised prior to trial.

28

court held that the guilty verdicts returned against the defendants made any inquiry into the grand jury proceedings unnecessary.  Notably, the district court did not discuss, or even cite, Bank of Nova Scotia.[35]

The court's reliance on Mechanik was an erroneous application of the law, and, as such, constituted an abuse of discretion.  Bank of Nova Scotia eviscerated Mechanik's central holding, and clearly stated that a guilty verdict is no longer sufficient to validate the underlying indictment.  Rather, it is incumbent upon the court to examine the grand jury proceedings themselves and determine whether the alleged violations substantially influenced the grand jury's decision to indict.  We cannot, therefore, affirm the district court on the ground that it properly applied Mechanik.  We must still affirm the district court's decision, however, if the alternative ground upon which the decision relies is valid.

2.

The district court's alternative reason for denying Sigma's motions to dismiss the indictment was that, based on the record before the district court, Rubinstein's conduct did not warrant dismissal.  In making this ruling, the court

---

[35] In our order granting rehearing, see supra note 27, we asked the parties to brief, inter alia, whether the district court's failure to cite Bank of Nova Scotia and our decision in United States v. Kramer, 864 F.2d 99 (11th Cir. 1988), was error.  After reviewing our decision in Kramer, we are satisfied that the discussion of Mechanik in Kramer is mere dicta.

was misled to assume that it had the complete transcript of the grand jury

proceedings before it.   During an exchange outside the presence of the jury on

September 11, 1996, Rubinstein told the court that he had filed

> the total grand jury transcripts for that particular session of the [third]
> grand jury.  That was the two-day session that resulted in the
> indictment and the third grand jury that considered the matter.  I did
> not file those in open court [they were filed under seal] because they
> are [Federal Rule of Criminal Procedure] 6(e) materials and very little
> of them are Jencks [Act statements], I believe.

(emphasis added).  A few moments later, the court sought to clarify what

Rubinstein had filed by asking, "Mr. Rubinstein, it's my understanding that what

you have filed with the court is a complete copy of the grand jury's, the indicting

grand jury – or the grand jury transcript, the indicting grand jury; is that right or

not?"  (emphasis added).  Rubinstein's response was "You're right to have that

understanding."  (emphasis added).  In fact, Rubinstein had not filed all of the

transcripts of the proceedings before the third grand jury.  Instead, he had filed

three excerpts from those transcripts: the first half of the first day's session on

September 13 and two excerpts from the testimony of Agent Siberski on

September 14.[36]

---

[36] Agent Siberski testified before the grand jury on both September 13 and 14; however, Rubinstein did not file the transcript of the testimony Siberski gave the first day.

The deficiencies in the record the district court had before it when issuing its order are fatal to the court's findings.[37]  As a result of Rubinstein's misleading statements to the court, the court could not make an informed ruling.  For instance, the court found that while Rubinstein did not present the indictment to the second grand jury during its entire twelve-month term – but waited, instead, to present it to the third grand jury (based solely on the evidence presented to the second grand jury) – his actions were not "suspicious."  Rather, the court found that Rubinstein's statement – that he did not want to "seek an indictment [from the second grand jury] until after the deposition of an important witness in India, P.P. Makkar" – was a "reasonable explanation."

Had the court been able to examine the complete transcript of proceedings before the third grand jury, which Rubinstein had in fact not filed with the court, it would have learned that the third grand jury indicted Sigma <u>without</u> the aid of Makkar's deposition, and that the indictment was rendered less than two weeks

---

[37] It is unclear from the district court's order exactly what the court reviewed in ruling on the motions to dismiss the indictment.  Sigma provided the court with the redacted transcripts that the Government had turned over pursuant to the Jencks Act.  Rubinstein had also told the court that he had filed under seal the transcripts of the entire grand jury proceedings.  However, the court's order, in discussing the Government's conduct, makes no reference to transcripts other than those turned over to Sigma.  Further, the court declined to consider several of Sigma's allegations of misconduct that were not set out in detail (which could not have been since Sigma did not have access to the transcripts).  Thus, it is not evident whether, in ruling that Rubinstein's conduct did not prejudice the grand jury, the court was saying that there was no evidence of prejudice based on the entire proceedings or merely based on the Jencks Act transcripts.

after the second grand jury was discharged.[38]  Further, the remainder of the transcripts (which were never presented to the district court) evince numerous instances of improper and overreaching conduct, discussed infra Parts III.B and C.

The inadequacy of the record before the district court renders its alternative holding a nullity.  We cannot sustain the court's determination based on a fatally deficient record.  Therefore, whether the instant indictment should be dismissed remains an open question.

## C.

Having determined that the district court's denial of Sigma's motions to dismiss the indictment cannot be sustained, we confront the question whether to remand the case so that the district court can reconsider Sigma's motions after reviewing the whole transcript or to decide the validity of the indictment ourselves based on the record.  To answer this question, we consider what a court may

---

[38] Further, the assertion that allowing the second grand jury's term to expire was not suspicious is not a reasonable conclusion.  At oral argument before the panel, the Government conceded that grand juries normally served 18 months, but contended that the second grand jury was a "special grand jury" that was empaneled only for 12 months.  The record contains no explanation -- other than the statement in the court's April 21, 1997 order that Middle District of Florida grand juries normally serve 12 months -- as to why the second grand jury's term could not have been extended to permit it to consider the superseding indictment.  We note that the first grand jury served for a term of 23 months and that the third grand jury served for 18 months.

examine to determine whether the grand jury's decision to indict was substantially influenced by improper evidence. If the district court, on remand, would look only to the same cold record that we currently have before us, we may determine the validity of the indictment without remanding.

Rule 6(e)(1) of the Federal Rules of Criminal Procedure requires "[a]ll proceedings, except when the grand jury is deliberating or voting, [to] be recorded stenographically or by an electronic recording device." A court will certainly rely on these transcripts in determining whether the grand jury was overborne. By providing the court with an exact account of what transpired in the grand jury room, the transcripts give the court circumstantial evidence as to whether the grand jury acted as an independent body.

The transcripts do not, of course, provide direct evidence of what the jurors were thinking. The most direct way to determine that would be to hold a hearing and question each juror. Such an evidentiary hearing would be inappropriate, however, because the district court lacks the power to summon the grand jurors and inquire as to their reasons for returning the indictment.[39] See John Roe, Inc. v.

---

[39] The only other person who could have relevant information would be the prosecutor. Because the prosecutor was in the room with the grand jury, he would be able to comment on the jurors' physical reactions or he would have knowledge of conversations he had with grand jurors outside the grand jury proceedings. Besides the hearsay problems such testimony would present, Sigma would not be able to conduct an effective cross-examination of the prosecutor because Sigma could not call grand jurors to refute the prosecutor's testimony. This same cross-

United States (In re: Grand Jury Proceedings), 142 F.3d 1416, 1426 (11th Cir. 1998).

Consequently, the only evidence on which a court can rely in determining the validity of the indictment is the cold record of the grand jury proceedings. The district court would use the same cold record that is currently before us. We will therefore proceed to determine whether the record yields inferences that demonstrate that the grand jury was not acting independently when it returned the instant indictment. We begin by discussing our authority to review grand jury proceedings; next, we examine what occurred before the third grand jury; and finally, we consider the appropriate inferences to be drawn from the transcripts.

III.

A.

If the Fifth Amendment's promise that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury," U.S. Const. amend. V, means anything, it means that a criminal indictment must actually issue from a grand jury, and not some other source. The fundamental concept underlying the Fifth Amendment guarantee is that in order for

examination problem would also prevent the court from hearing evidence from a grand juror who volunteered to testify – the opposing side could not call witnesses to refute the testimony.

34

an indictment to be recognized as actually issuing from a grand jury, it must be the product of an investigative deliberation that is <u>independent</u> of both the prosecuting attorney and the court. See <u>United States v. Williams</u>, 504 U.S. 36, 49, 112 S. Ct. 1735, 1743, 118 L. Ed. 2d 352 (1992) ("Recognizing [the] tradition of independence [of the grand jury], we have said that the Fifth Amendment's constitutional guarantee <u>presupposes</u> an investigative body acting independently of either prosecuting attorney <u>or judge</u>.") (emphasis in original) (internal quotation marks and citations omitted); <u>United States v. Dionisio</u>, 410 U.S. 1, 18, 93 S. Ct. 764, 773, 35 L. Ed. 2d 67 (1973) (finding that a grand jury "must be free to pursue its investigations unhindered by external influence"); <u>Wood v. Georgia</u>, 370 U.S. 375, 390, 82 S. Ct. 1364, 1373, 8 L. Ed. 2d 569 (1962) (recognizing "[t]he necessity to society of an independent and informed grand jury"); <u>John Roe, Inc. v. United States</u> (<u>In re: Grand Jury Proceedings</u>), 142 F.3d 1416, 1425 (11th Cir. 1998) (explaining that although a grand jury relies on the judiciary when it seeks subpoenas or contempt sanctions, it "performs its investigative and deliberative functions independently"). Without a guarantee of independence, the indictment would not be the genuine issue of a grand jury within the meaning of the Constitution.

35

It is clear, for example, that if a prosecutor simply drew up an "indictment," had a grand jury foreperson sign it, and then used it to charge the defendant with a criminal offense, we would dismiss the "indictment" out of hand as violative of the Fifth Amendment. This is because the "indictment" would in no sense be the product of a constitutionally required grand jury proceeding. So, too, would we dismiss an indictment that was issued by a "kangaroo grand jury" – one whose deliberations were so overborne by a prosecutor or judge that the indictment was, in effect, the prosecutor's or judge's handiwork, and not the result of a considered judgment by an independently functioning grand jury. See United States v. McKenzie, 678 F.2d 629, 631 (5th Cir. 1982) (holding that an indictment may be dismissed "when prosecutorial misconduct amounts to overbearing the will of the grand jury so that the indictment is, in effect, that of the prosecutor rather than the grand jury"); see also Stirone v. United States, 361 U.S. 212, 218, 80 S. Ct. 270, 273, 4. L. Ed. 2d 252 (1960) ("the very purpose of the requirement that a man be indicted by a grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge.").[40]

---

[40] Stirone relied on and reaffirmed the proscription of Ex Parte Bain, 121 U.S. 1, 10, 13, 7 S. Ct. 781, 786, 787-88, 30 L. Ed. 849 (1887), against court amendments to an indictment. Bain held that a judge's excessive interference in grand jury proceedings violated the Fifth Amendment. Bain, 121 U.S. at 10, 7 S. Ct. at 786. In Bain, the trial judge struck a portion of the indictment as surplusage, thereby (according to the petitioner) making it easier for the government to prove its case. Id. at 5, 7 S. Ct. at 783. The Supreme Court's subsequent

Subsequent Supreme Court cases have reaffirmed the importance of the Fifth Amendment's Grand Jury Clause, implying that courts have the authority to dismiss an indictment that is the product of a grand jury process so flawed that the grand jury's independence has been infringed. In Bank of Nova Scotia v. United States, 487 U.S. 250, 108 S. Ct. 2369, 101 L. Ed. 2d 228 (1988), the Supreme Court held that even though a district court must find that an error in the grand jury proceedings actually prejudiced the defendant in order to dismiss the indictment, "[i]n the case[] before us we do not inquire whether the grand jury's independence was infringed. Such an infringement may result in grave doubt as to a violation's effect on the grand jury's decision to indict, but we did not grant certiorari to review this conclusion." Id. at 259, 108 S. Ct. at 2375-76. Williams lends further support, despite holding that a district court's supervisory power could not be invoked to compel a prosecutor to disclose exculpatory evidence to a grand jury. In Williams, the Court acknowledged that the defendant did "not contend that the Fifth Amendment itself oblige[d] the prosecutor to disclose substantial exculpatory

---

repudiation, in United States v. Miller, 471 U.S. 130, 142-43, 105 S. Ct. 1811, 1818, 85 L. Ed. 2d 99 (1985), of "the proposition that the striking out of parts of an indictment invalidates the whole of the indictment" does not affect the continuing validity of Bain's generalized proscription against court interference in the grand jury process or Stirone's requirement that the defendant be convicted of the specific offense charged in the indictment. In Miller, the Court held that "[t]he proposition that a defendant cannot be convicted of an offense different from that which was included in the indictment [that] was broadly declared in Bain . . . has been reaffirmed in a number of subsequent cases." Id.

evidence in his possession," Williams, 504 U.S. at 45, 112 S. Ct. at 1741,

implying that the court had the authority to act if the Grand Jury Clause had been

violated.[41]

---

[41] Federal courts have generally assumed that their authority to remedy errors in grand jury proceedings flowed from two sources: (1) the Constitution; and (2) the court's supervisory power. See, e.g., United States v. Larrazolo, 869 F.2d 1354, 1357-58 (9th Cir. 1989) (describing the two sources); United States v. McKenzie, 678 F.2d 629, 631 (5th Cir. 1982) (same).

Under the authority of the Constitution, a court may dismiss an indictment if the court finds government conduct that "significantly infringe[s] upon the grand jury's ability to render independent judgment" so that the indictment is not, in reality, that of the grand jury, and, thus, a constitutionally mandated indictment is absent. Larrazolo, 869 F.2d at 1357; see also McKenzie, 678 F.2d at 631. The court's power to dismiss an indictment under its supervisory authority is premised on its inherent authority to, "within limits, formulate procedural rules not specifically required by the Constitution or the Congress." Bank of Nova Scotia, 487 U.S. at 254, 108 S. Ct. at 2373 (internal quotation omitted). The court's authority to invoke its supervisory authority in the grand jury context is more limited than its power to supervise trials. See Williams, 504 U.S. at 50, 112 S. Ct. at 1744 ("[A]ny power federal courts may have to fashion, on their own initiative, rules of grand jury procedure is a very limited one, not remotely comparable to the power they maintain over their own proceedings.").

Bank of Nova Scotia and Williams support the distinction between the court's constitutional and supervisory authorities. Both cases involved the lower courts' use of their supervisory power to dismiss an indictment based on non-constitutional violations. See Bank of Nova Scotia, 487 U.S. at 258, 108 S. Ct. at 2375; Williams, 504 U.S. at 45, 47, 112 S. Ct. at 1741, 1742 (stating that the case did not implicate the requirements of the "Fifth Amendment itself," and dealing exclusively with the extent of the "'supervisory' judicial authority").

Williams, however, creates some ambiguity concerning whether a court's supervisory power is still conceptually distinct from its constitutional authority. Williams states that a court's supervisory power may be invoked to enforce those legally compelled standards which come from a "Rule, statute, or the Constitution." Id. at 46 n.6, 112 S. Ct. at 1741 n.6. Because, at least prior to Williams, the Constitution had been seen as an independent source for a court's authority to dismiss an indictment, this language in Williams about the courts' supervisory authority encompassing constitutional violations casts some doubt over whether the two sources remain distinct or if the Court has conflated them.

What is clear is that regardless of whether the Fifth Amendment's Grand Jury Clause remains a distinct source of authority that courts can draw upon, or the Fifth Amendment has now been folded into the courts' supervisory power, courts still can and should remedy violations of the Grand Jury Clause. While the conceptual quagmire might be significant in some cases (and thus the question of whether a court's Fifth Amendment power and its

Although numerous constitutional protections afforded criminal defendants have no application in the grand jury context, see Williams, 504 U.S. at 49-50, 112 S. Ct. at 1743-44 (collecting cases); but see, e.g., Vasquez v. Hillery, 474 U.S. 254, 263-64, 106 S. Ct. 617, 623-24, 88 L. Ed. 2d 598 (1986) (holding that racial discrimination in the selection of grand jurors, in violation of the Fourteenth Amendment's Equal Protection Clause, compelled dismissal of the indictment), the Supreme Court has never retreated from the fundamental proposition that "the Fifth Amendment's constitutional guarantee presupposes an investigative body acting independently of either prosecuting attorney or judge," Williams, 504 U.S. at 49, 112 S. Ct. at 1743 (emphasis in original) (internal quotation marks and citations omitted).

The Fifth Amendment requires that an indictment issue from an independent grand jury. Where a grand jury proceeding is so corrupted by the conduct of a prosecutor or judge that it "substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from . . . substantial influence," Bank of Nova Scotia, 487 U.S. at 256, 108 S. Ct. at 2374 (internal quotation marks and citations omitted), courts should not hesitate to

supervisory power are separate or conflated may one day have to be answered), it is clear that, under either understanding, where a grand jury is so overborne by a prosecutor's or judge's influence that the indictment that issues cannot meaningfully be called "of a Grand Jury," U.S. Const. amend. V, the indictment must be dismissed.

39

remedy the violation because the indictment is not, in reality, "of a Grand Jury,"

U.S. Const. amend. V.

## B.

To determine whether the prosecutor's conduct so overbore the will of the

grand jury that the appellants were denied their Fifth Amendment grand jury right,

we now examine the complete transcripts of the third grand jury proceedings.[42]  In

examining the transcripts, we are mindful that the ultimate issue is not the

propriety of Rubinstein's conduct, but whether that conduct, under the

circumstances, abrogated the independence of the grand jury.

As noted above, the third grand jury was empaneled on September 6, 1995, a

Wednesday, the same day the second grand jury was discharged.  Rubinstein took

this case to the third grand jury on Wednesday, September 13.  He introduced

himself to the grand jury as follows:

> My name is Mike Rubinstein and I'm an Assistant U.S. Attorney, and
> I'm here to present to you this morning some evidence and some legal
> explanation about a case which we'll be asking you to vote on and
> consider tomorrow.

---

[42] Of the portions of the transcripts we replicate, we underscore those that are most
pertinent to our analysis.

Following this introduction, Rubinstein handed a copy of the (superseding) indictment, consisting of twenty-one pages and twelve counts, to each member of the grand jury and said,

> you'll notice it's called a superseding indictment. And what that means is that there was another indictment related to this case that's already been returned by a different Grand Jury. And one of the people [Huang] who is on this list of defendants is already under indictment, and this case is basically an expansion of the indictment against that one individual.
>
> So the case already has a number and it's already been assigned to a judge. The 24(c) indicates it's Judge Bucklew. So this case is already a live case, but what we're doing is we're greatly expanding it and we're adding a whole lot to the original indictment and I'll explain that.

Then, before he reviewed the indictment with the grand jury, Rubinstein explained how the case came to him.

> [T]he case was . . . finally [assigned] to me, and I called quite a number of witnesses before the [second] Grand Jury and we did a lot of investigation. We got a lot of documents and records.
>
> A Grand Jury before you had heard this case for a long time, a lot of witnesses, a lot of discussion. They went out of existence <u>last month</u> [actually, last week, <u>the day the third grand jury was empaneled</u>]. Okay. <u>They went out of existence before they could consider this indictment.</u> They've never seen the document [i.e., the superseding indictment] that you have. <u>They were very unhappy about that because they had spent a lot of work on it.</u> However, it just worked out that way for reasons that they had nothing to do with. (emphasis added).

Later in the first day of proceedings, Rubinstein added:

41

The problem that [the second grand jury] had was that [it] <u>wanted to vote on it</u>. They wanted to be in a position to hear the evidence and decide, just as you're being asked to do, since they'd heard it for months. They'd heard these witnesses and they were interested in it and <u>they were following it very avidly</u>. And then I came to them and I said, I'm sorry, you're not going to get a chance to vote on this case because of an administrative situation in my office with the travel budget basically. So until we resolve that, I don't have time. <u>And they all said, oh, I'm so sorry, good-bye</u>, and now I'm presenting it to a new Grand Jury. That's what I said. That's what I meant to convey to you. (emphasis added).

Rubinstein then explained the "administrative situation" that had delayed the second grand jury's consideration of the case.

Essentially what occurred was we presented this case to a committee in my office who votes on whether or not the indictment should proceed. You see at the end of this document[, the superseding indictment,] that you have there's a signature by [AUSA] Robert Monk – and by the way, don't be influenced by the signatures. They don't mean anything except internally to us – but he is my supervisor.

And then he and others said, well, there's some administrative budgetary considerations that had to do with the budget in our office, nothing to do with the case, and we think that the U.S. Attorney himself should consider this because we have no – there's a lot of money that has to be spent on this case and before I approve this, I want to make sure that all the money is approved to spend because I don't want to get into something and then have to – you know, what are we going to do? I mean, <u>we've already charged people with a bunch of crimes</u>. What are you going to say, sorry, we don't want to spend the money? So the U.S. Attorney had to consider it first, and he said, yes, go ahead, do what you need to do.

<u>Well, in the time it took to do that, that Grand Jury went out of existence. So because of that little bureaucratic holdup, they never got to vote.</u> (emphasis added).

Rubinstein later added:

42

And just for your information the bureaucratic problem that held up the last Grand Jury . . . was the expense of going to India to take [Makkar's] deposition. My supervisor wanted to make sure that the U.S. Attorney would be willing to underwrite the expense . . . .[43]

Having explained to the jurors how he became involved with the case and how the case came to be before them, Rubinstein described how he wanted to proceed over the next two days.

So what I would like to do – and it may not be possible, and I don't want you to feel like you have any – that you're rushed in any way. But <u>I am rushing you</u>, but I'm really not in the sense that if you don't like it or if you feel that you need to know more, just tell me so.

[T]he plan is – <u>my plan</u>, and it's not necessarily your plan – <u>is to try to summarize  basically everything that has gone on so far in two whole days</u>, basically, and explain to you in these two whole days what the previous people[, i.e., the members of the first and second grand juries] have considered, the evidence that they've heard, have people available to answer your questions, and then ask you if you are ready to vote on this indictment.

And by the time – by the end – by tomorrow afternoon, hopefully you'll be familiar enough with this indictment . . . . [and] if you feel that you're ready to vote, <u>I'm going to ask you to vote on it tomorrow</u>. If you don't feel ready, you tell me. Okay?

. . . .

---

[43] The third grand jury actually returned the indictment without Makkar's testimony. In February 1996, long after the indictment issued, Rubinstein (and defense counsel) traveled to India, and Rubinstein took Makkar's deposition via video tape. At trial, the tape was introduced into evidence and played before the jury.

In his video taped deposition, Makkar testified that he was originally interviewed in connection with this case on July 13, 1995 (which was long before the second grand jury was discharged). In that interview, Makkar told Inspector Govindan Nair of the Indian Central Bureau of Investigation that he would be willing to submit to a deposition in India, but for health reasons could not travel to the United States.

So I want to start out by sort of making an opening statement about the facts of the case, who these people are, what the general evidence is, sort of like an opening statement in a trial, and then <u>I'll let you ask me any questions that you want</u>.
. . . .
I'll sort of screen [your] questions so that we don't get glitches in the record, because essentially what happens is that many of the witnesses who testify here – let's assume that you indict these people. Let's assume that there's a trial. Okay. Let's assume that one of those witnesses that testifies here ends up testifying at the trial about the same things that he told you. Before the trial, I have to turn over a transcript of what he said to the defense attorneys. They read it over and they look for mistakes, inconsistencies, ways to prove he's lying or he didn't remember or whatever. Very often it's just, you know, you'll ask some question – like you might ask, well, have these people ever done anything like this before, and he'll say something. And then they'll get the transcript and then they'll say, well, obviously the Grand Jury was prejudiced by – because the witness said that these are major criminals. And that isn't true, but I'm just saying that's an example of how an innocent question can get turned into something that messes up the case.

So that's why I want to screen the questions . . . . (emphasis added).

Rubinstein did not "screen" the questions asked by members of the second

grand jury. His explanation for doing so with the third grand jury was:

You might notice . . . ladies and gentlemen, in th[e second] Grand Jury the Grand Jurors are asking the questions directly. We had finished – I had finished my questions and the Grand Jurors were asking questions and, as a result, the witness was talking for a long time and it went on for [a] long time, which is fine. But the reason that I wanted to use a different system basically was that it did take so much time. And if you do want to ask questions directly, if you think that's important, just let me know and we'll change that. <u>I want to rush you</u>, but I don't want to rush you unfairly if you feel that – you know, that I'm going too fast. (emphasis added).

44

After taking care of preliminary matters – how he got involved with the case, how the case got to this grand jury, how he would present the evidence, and how the jurors were to ask questions – Rubinstein spoke for the first three-quarters of the day on September 13. First, he explained Sigma's business enterprise,[44] the company's organizational structure, how the individual defendants named in the indictment functioned within that structure, and how the FDA's and Custom's regulatory systems worked. Then, Rubinstein had the jurors read the indictment that he had prepared (which the grand jury returned the next afternoon). He went through the indictment allegation by allegation, count by count, identifying those who were to be indicted and, with respect to the conspiracy count in particular, explaining the roles they played in Sigma's scheme to violate the food and drug importation laws.

Turning to the conspiracy charge, Count One, Rubinstein told the jurors that he was going to give them a "law school type lecture" on conspiracy.

> This happens to be difficult – this is a fancy conspiracy. . . . So if you understand this conspiracy, you can understand any conspiracy. And I will explain the law of conspiracy to you so that you will understand it and, if you don't, you can ask me questions until you're blue in the

---

[44] On the second day, September 14, Rubinstein described Sigma with these words: "Now, Sigma also has a lot of very strong financial backing. As you can see, it's one of a group of very large, prosperous companies all over the world. And it probably has enough financing to stay in business through a lot of hard times."

face and I'll answer them, okay, because you need to understand the law of conspiracy.

As part of his lecture, Rubinstein gave the jurors an example of a conspiracy.

<u>The example was practically identical to the conspiracy charged in count one</u>.

Let's say that the United States has an elaborate system for making sure that decomposed or contaminated or otherwise adulterated food doesn't enter the United States, doesn't get sold to people there if it entered into interstate commerce. And let's say that the United States government through the Customs agency and the FDA have this system that we just described trying to stop certain foods from coming into the United States doing automatic detention on some, doing surveillance samples on some; sets up this system, okay.
    And let's assume that some company that wants to save money or save – or avoid problems or whatever else buys shrimp cheaply and sell it high and make more money that way, or for whatever reason decides that the system that the United States has set up is very burdensome, expensive, cumbersome, and they would like to figure out a way to get around the system.
    And let's say that they agree together and they figure out some way that they'll get their product in and it will not go through automatic detention even though maybe it otherwise should go through automatic detention, and that way they can save money and whatever. Okay? And they figure out how to do that. They plan to do that. They agree that that should be done. And then they – in this case, [i.e., the instant case] we allege that they actually carry it out.
. . . .
    The indictment is the story of the case so that you or anybody else who wants to understand what they did ideally would be able to read this document and understand – make some sense out of what they did.

As he walked through the indictment, Rubinstein paused on several

occasions to tell the jurors what the evidence would show, for example:

Now, in summary, what the evidence will show is that Sigma and these individual defendants, or some of them, conspired to substitute the invoices for two specific shipments – actually more than two, but two that we get into detail on – two specific shipments of frozen shrimp from India.

Regarding Count Four of the indictment, the obstruction of justice charge, Rubinstein said that the defendants knew they were being criminally investigated in April 1994, yet tried to obstruct justice by sending fraudulent faxes to (1) make it look like Sigma really had a contract with Silver Star to pack shrimp and (2) convince someone in India to tell Customs that Sigma had a contract with Silver Star.

And then the overt acts [alleged in the indictment], I'll go into those because they're relatively brief. It says that first on March 26, '93, Kannikal, who was in India, told Huang and Walton in a fax – and we'll show you – we have faxes with – these faxes were seized in the search – that he had received a telephone call from a Customs agent and that he was – and whenever we have it like this, this is exactly what the fax said – "Really worried because of this. What ever it is I [will] act according to your instructions. In fact I still don't know what is real problem [sic] with this case."
. . . .
So we know that Kannikal did, in fact, follow the instructions, met with the Silver Star guy, spent hours with him, tried to persuade him, but he wouldn't bite.
. . . .
. . . In fact, Bliss Impex did submit a false written statement and it was found in the search of Sigma's premises and we have the false statement from Bliss Impex.

Paragraph ten on page twelve of the indictment alleged that on or about July 21, 1992, Kannikal sent a fax to Walton which read: "Bliss entered into a contract with Coral now all future packing will be in the name of Coral. Silver cancelled contract with Bliss since Silver going to start their production." In response to a juror's question about the significance of that paragraph, Rubinstein said:

> The significance of that is that that tells you that on that date, okay, on that date, you know that Andy Walton knows – what does Andy Walton know that his agent just told him?
> He told him, one, that Bliss had canceled – Bliss entered into contract with Coral now. All future packing will be in Coral. Silver canceled contract with Bliss.
> You now know that Andy Walton knows that as of that date. Okay? Just keep that in your mind when you hear the rest of the evidence and the significance of it will emerge. Okay? Because that tells you what Andy Walton knew and when he knew it. So if Andy Walton does or says anything after the 21st of July of 1992, you can ask yourself in your own mind: Was he telling the truth or was he not? Okay? (emphasis added).

After Siberski explained that the date of a particularly important fax (July 24, 1992) coincided with the date Inspector Harvey visited Sigma to take pictures of the shrimp being washed in chlorine, Rubinstein spelled out what the grand jurors should assume and the inferences they should draw from Siberski's testimony:

> Remember the agent's earlier testimony was that Norm Harvey went out there and he came back again at another time and he said bring the cartons out. He went out there and he saw the 525 cartons with the labels ripped off. He went back to his office to look at the paperwork.

He saw the typewriting on a slant and darker. He called Customs. He told Customs there's a problem with that, take a look at it. Then he went back out again and he said: Pull those cartons back out, I want to take another look at them. That was the 525 cartons. And he looked at the cartons and he saw that the labels had been ripped off and he took photographs.

On that same date, after they see the inspector taking pictures of the labels, Andy Walton gets nervous. So he knows that this other shipment's coming because he's got the paperwork, and he's already taken care of the paperwork. The paperwork is okay. It looks good. But he knows that he got in trouble before on the stupid labels. So he gets back to Kannikal and he says: I know you did the paperwork, but what about the labels on the cartons? I need to know that right away.

. . . .

. . . They know that [the FDA inspector's,] seen it because they've seen him taking pictures of the labels. And that's what that fax is about. And that date is a very important date because it's the same day as the pictures were taken.

. . . .

Now, the paragraph – the long paragraph above it is very interesting, because what that paragraph is is Andy Walton telling Goegy [sic] Kannikal this is the story, okay, this is the situation: We originally contracted to buy from United Marine.

He's saying at first: I want you to contact Bliss and Silver Star pertaining to the two shipments. . . .

. . . .

So in other words, Goegy [sic] is telling Jag Reddy up there at Sigma Cochin – he's telling him that Makkar, who is the managing director of Silver Star, who was supposed to sign this letter, he's not comfortable with this and he's going to IMPEDA, the India Commerce Authority, and saying either IMPEDA will send me a letter or Customs will send me a letter requesting that I send this letter that you want me to sign. If they don't – if I don't get okay from Indian authorities and I don't get the okay from U.S. Customs, I'm not sending any letter like that.

And here Goegy [sic] Kannikal is telling Reddy this is the status, so I'll keep you posted of progress. So far haven't gotten a letter.

49

. . . .

So they're aware – Kannikal is aware in India that Agent Siberski in Tampa is trying to get the shipment details from Makkar, that he's talking to Makkar.

. . . .

We don't want to speculate about their income and taxes and expenses because, you know, without knowing every expenses that they had, we'd never be able to prove that. <u>We can assume – I think you could fairly assume</u> that nobody would go through the trouble of doing all this if they didn't think they would make enough money to make it worthwhile to do this. But how much money, who knows?

. . . .

And, you know, one thing to think of in terms of – and let's assume that they were – let's say that – give them the benefit of the doubt and let's say that it really was Silver Star that packed these shipments, it really wasn't Coral Sea. Well, why would Silver Star, who took the effort to get on the approved list and, you know, spend the money or whatever to have a clean plant, why would it put its shrimp in cartons that say Coral Sea, which is one that was off the list?

. . . .

If you recall the first fax that you saw, the first overhead dated July 21st, you asked me what's the significance of that, and I said it was because in Andy Walton's mind he knew something. He was told that Coral Sea – that Silver Star, which had had a contract with Bliss, has canceled the contract, they're now doing their own packing. From now on, all packing for Bliss will be by Coral Sea. Remember that?

So Andy Walton knew that there was this relationship. . . .

So he knows on the 21st, because he's told by the same person he keeps talking to by fax here.

. . . .

The importance of [the Indian Central Bureau of Investigation contacting Sigma's agent, Kannikal, in India] is that we're charging an obstruction of justice, obstruction of an agency investigation specifically. And the indictment alleges that when Andy Walton was feeding this line to Kannikal about being forgetful and here's the story that you tell and so forth, and apparently Kannikal took his advice,

50

that was just the same as if he were dealing with American customs, because it was just an agency relationship.

. . . .

So what Andy Walton is saying here is he is making up history. He's creating history in this paragraph . . . .

. . . .

Now, another story that [,Walton's,] giving him <u>that you know that he knows isn't true</u> is we were under the impression that this product was packed and processed by Silver Star, as had been all previous shipments. He's saying that the product was purchased from Bliss Impex and we always thought it was packed by Silver Star. (emphasis added).

At the opening of the second day's proceedings on September 14, Rubinstein began:

Just to refresh our recollection, Mr. Sonnier – I think the most salient thing that he had said in his testimony concerned the fact that he said that he was present on the morning that this container of 525 cartons of shrimp had come in, or that it was there, too, and he noticed that it had labels of an unapproved packer.

Moments later, a juror asked Rubinstein whether a particular document existed, and this exchange followed:

Grand juror: I don't think you have to bring it to me as long as you say it does exist.
Rubinstein: Oh, sure. Yes it does.

Rubinstein then continued with his presentation, during which he expressed his view as to the credibility of two individuals associated with Sigma: Paul Fulford and Charles Sternisha. Rubinstein had interviewed Fulford and, in his

words, "didn't believe" him. Because a jury would probably not convict Fulford,

however, Rubinstein decided not to have him indicted.

> And when we got through talking to [Fulford], I personally made the decision that we would never be able to convict him because he would be able to persuade a jury that – raise a reasonable doubt that he was just a dumb guy who was doing what somebody else told him to and he never understood what he was doing anyway. And I didn't believe him, but I didn't think that I could convict him beyond a reasonable doubt since he was as we call a mope. He was just a guy that was basically doing what he was told to do and he wasn't particularly well trained or particularly experienced or anything like, for example, in the case of Charles Sternisha. . . .

Indicting Sternisha, though, was another matter, because, according to

Rubinstein, Sternisha lied and ought to be indicted.

> Charles Sternisha . . . we believe lied in the Grand Jury when he testified here in 1993 and said that he didn't know anything about the labels being ripped off.
> . . . .
>   So, I mean – so it appears that Mr. Sternisha lied to the Grand Jury. And we know that his handwriting – he's the one that made up the chemical formula. So that's why I think he's a good prospect to get indicted. (emphasis added).

Not long after, Agent Siberski told the grand jury that he, Agent Matteson,

and Rubinstein, in an effort to "be as fair as [they could]" to Sigma and the

individuals named as defendants in the indictment, had collected a lot of evidence.

In doing so, Siberski vouched for his own integrity and credibility and for

Rubinstein's as well:

> If I may add in also, what we're showing you here is a sampling of evidence. We have a lot of documents, a lot of faxes, a lot of supporting documents, so forth and so on. <u>We could be here for days going through them one after another, after another, after another</u>. And so – but we're trying to give you the pertinent ones to help you understand.
> . . . .
>     And keep in mind, you know, my job as a Federal law enforcement officer, as a police officer, is to search for the truth and gather evidence to that effect. And so we wanted to be as objective and as fair as we possibly could. And in that respect, what we did when we looked at the documents, we wanted to try to understand those documents to the best of our ability.
>     What that required in some cases was . . . [w]e brought [witnesses] out here after first having taken a considerable amount of time to go through the documents, understand them, follow the money trail, so forth and so on.
>     I'm only giving that to you as one example of the effort that we put in to try to understand this and be as fair and objective as we can.
> . . . .
>     And again, you know, my concern and <u>Mike Rubinstein as an Assistant U.S. Attorney is probably one of the most insistent on this as I've ever seen, be fair, be objective, let's get to the truth and let's be as fair as we can to everybody involved</u>. (emphasis added).

Later that day, after commenting on some documents he or an FDA agent

had presented to the grand jury, Rubinstein expressed his personal opinion as to the

quality of shrimp that came into Sigma's plant:

> Now, you've heard testimony about how much shrimp there was. You've seen all these cards, all these lots. It's a huge amount, basically.

All the shrimp that comes into [Sigma's] plant basically has come there because somebody else has determined that they didn't want it because it had a problem. So it wouldn't be there in the first place.

. . . .

Rubinstein: I don't think anybody can argue that that shrimp isn't an inferior product, no matter what you say.

Grand Juror: After it's been washed?

Rubinstein: Yes. I think that <u>in my opinion</u> and the opinion, I think, of most shrimp consumers, that is not what they consider to be a shrimp that they want to buy or eat. It's an inferior product. Their customers said it was an inferior product. Their customers sent it back. (emphasis added).

At this point, the exchange between the grand juror and Rubinstein evolved into an argument, during which Rubinstein, relying on what his "scientists" had told him, testified that "the shrimp was inferior" and that Sigma tried to make it seem like it wasn't:

Grand Juror: All I'm saying is that I don't see any evidence here that you've presented to us so far that you've got a case that you've actually adulterated shrimp. You haven't done what it says here.

Rubinstein: We haven't done what?

Grand Juror: You haven't concealed – you haven't proven that you've concealed an inferior product because it smells good, it tastes good –

Rubinstein: So your argument is that the shrimp is actually better than it was?

Grand Juror: No. Just as good. No more.

Rubinstein: Okay. It's just as good. So the fact that it was originally decomposed and treated with these chemicals, now that they've killed the germs –

Grand Juror: All you've got left is a good shrimp.

Rubinstein: – turned the indoles into something else, whatever is left is just as good as it was when it started with and there's no proof.

54

Well, that's a good argument and you'll have to vote on that. I mean, that's what you're here for.

Grand Juror: I'm just suggesting when you prepare your case –

Rubinstein: There's no more – thank you. But, you know, there's no more – I mean, I don't think – because I've gone through this with scientists. All right. I don't think I'm going to ever get from any scientist any more than I've already gotten. Okay.

I think that this is the story. The story is it's decomposed and this is what they did. And the question is: Was the shrimp inferior and did they try to make it seem like it wasn't inferior? I say yes. You know, I say I could convince a jury that's true. Your argument is a good argument and there's no answer to it.

. . . .

[Also,] Grayson Rogers and Mr. Staruszkiewicz would say to you that what makes the shrimp smell bad is not the bacteria itself but the fact that the bacteria – and I think that that was in Staruszkiewicz's testimony which was read to you – the bacteria has gone to work. And when the bacteria goes to work, it eats and digests and does its work on the flesh of the shrimp.

. . . .

We decided to pick out a few particular lots that had numbers on them that we could easily show through documents and other means they did this to this, and it's very clear. So we tried to limit it to the ones that were the most clear, and we'll show you how we come to that conclusion and what the evidence is that supports that. (emphasis added).

After Siberski finished testifying on September 14, Rubinstein presented Zeb Blanton, supervisor for the Central Florida District of the Florida Department of Agriculture's Division of Food Safety, to the grand jury. During Blanton's testimony, Rubinstein responded to a juror's question about how inspectors could tell if shrimp was bad by saying,

55

[w]ell, let me just add this: you'll be having additional testimony here from one of the foremost experts in this field who testified before the other grand jury, and will read you what he says about that.

. . . .

Okay. And to follow that up, <u>what we are going to do in the future is we're going to have some laboratory</u>, when we find – I think it's going to be the FDA Southeast Regional Lab in Atlanta <u>test the shrimp itself to see whether they can detect chlorine within the shrimp</u>, the flesh of the shrimp which is something that's never been done. And I don't know whether they can do that, whether they have a chemical test that can do that. But if they can, I want to try because I'd like to know that.

. . . That's something brand-new.

. . . .

And we know from what Zeb Blanton said when he did his own little test how the shrimp just soaked up the chlorine. So it's possible – I mean, we don't know, but it's possible that as to 7027 it may be because it has such a bad chlorine smell that's why that passed so well, that it had – it was just so overwhelmed with the chlorine that you couldn't really – you couldn't really test it. I mean, whatever it had, it didn't test. That's a possibility. I mean its not anything that we're saying is hard proof. (emphasis added).

But, in response to a grand juror question of "so they've actually admitted

[to the shrimp] being washed in the chemicals?" Rubinstein said,

[t]hey have admitted that they've used the – used some of the – yes, they have. They've admitted it. They were caught with it when the plant was searched. You'll hear testimony about that.

. . . .

Grand Juror: Do you in fact have proof of [Sigma] actually buying [Sea Fresh]? In the indictment you talk about the people that specifically bought it, I mean for this use?

Rubinstein: Yes.

. . . .

<u>That's why [Sigma sales representatives] were quitting</u>. <u>They were saying, I can't [sell bad shrimp] anymore</u>. <u>My customers are all</u>

hating me.  I'll never be able to be in the business.  I'll get out of this. And they came and they told us about it.  (emphasis added).

Several times during the second day of the proceedings before the third grand jury, Rubinstein summarized the testimony a witness gave before the second grand jury.  For instance, he explained that

> essentially what Mr. Stillwell testified to was that – he talked about how Sigma did business by selling the shrimp – by buying shrimp in foreign countries and delivering it.  So they would never really see the shrimp before.  It would just go directly to their customers in most cases.
> . . . .
> [Anita Layton] testified that there was no discount given to any customer.  She said that even though she insisted that all the customers knew about the wash, the Sea Fresh and the other chemicals, she said they accepted the product without any discount whatsoever.
> And she said that's one of Robert Fields' sales of 7000 shrimp. And she said definitely that shrimp would have been treated with chemicals.
> So that just gives you a concrete example of one of their internal records of which, you know, there's tons.
> . . . .
> Well, let me explain.  You heard testimony earlier – and we've heard a lot, so I'm not sure you remember it – but the salesman, Rick Stillwell, explained how the business worked.  And the way the business worked was the shrimp is in China.  The buyer is in California, or in Georgia.  They match it up by long distance phone, fax, whatever, and they say, that buyer wants that shrimp; send it over to him. And that's how they do it.  They never see the shrimp.  Okay. The only time they ever see any shrimp is when the buyer says we don't want it.  This started coming back to them.
> So they shouldn't have shrimp in their plant . . . .   (emphasis added).

Not long before the jurors voted on whether or not to return the (superseding) indictment, Rubinstein reminded them about the volume of evidence that was available for them to read through.

> You understand <u>we never did show you the records</u>.  Do you want to see the records that show – that we used to use to figure out that, for example, 6,030 was converted into 7,029?  Because we have the <u>internal records</u> from the company that shows why we picked out those numbers, and if you want to see them, we can show them to you.  Otherwise, we'll go on to counts nine through twelve.[45]
>
> . . . .
>
> Okay.  You've got the indictment here.  I went over it.  What I would like to do – what I'd planned to do, but you don't have to do it – is <u>I'd like to have you vote on this indictment now</u>.
>
> If you feel that this is all too fast, too sudden, too many questions, you want to hear more evidence, more witnesses, you want to see somebody in here, hear what he has to say or smell some shrimp or whatever it is you want to do, I'm here to help you do it.  If you want to do that, let me know and we'll do it.
>
> If you feel you're ready to vote on this, what I'd like to do is go over it with you if you have any question; if not, I'll just leave it with you and ask you to vote on it.
>
> So do you want me to leave the room while you decide what to do?
>
> Let me tell you something else, too, that I should have told you before.  Agent Matteson and Agent Siberski have, as you heard, served a great number of subpoenas.  They subpoenaed the bank that – that – with the international transactions on the Indian shipments. (emphasis added).
>
> . . . .
>
> We also have transcripts.  Every one of these witnesses that testified, we – as you've seen, <u>we tried to summarize the transcripts or</u>

---

[45] The previous day, Rubinstein had told the grand jurors,
[a]nd then from paragraph 9 on through the next few pages – <u>and you will eventually have to read these carefully yourself</u> . . . .  (emphasis added).

the most important parts, what I thought were the most important parts of the testimony. But the whole transcripts are available. We can reproduce them. We can Xerox them. We could give them to you to consider and you can take as much time as you'd like. Really it doesn't matter. I mean, this thing has been going on a long time and it could go on, you know, another couple of weeks.

So all that's available to you if you wish. You need just to let me know what you want to do and you can see anything that you want to see. Okay?

Do you want me to leave the room while you consider what you want to do and then I'll come back in a couple of minutes? I'll knock on the door and you can tell me whether you have any questions about this indictment, whether you want to vote on it now or whether you want something else, and whatever it is, we'll make it available. (emphasis added).

The next thing recorded in the transcripts, after Rubinstein left the room, is the return of the indictment.[46]


## C.

We now turn to the question whether improper evidence "'substantially influenced the grand jury's decision to indict' or [whether] there is 'grave doubt' that the decision to indict was free from the substantial influence of" improper

---

[46] The record does not reflect what time it was when the grand jury returned the indictment; it only shows Rubinstein leaving the room and then returning after the grand jury had reached its decision to indict. The record does reflect that a vote had occurred. The record also reflects that the grand jury took an hour lunch break, returning at 1:00 p.m. There are 135 pages of transcript between the end of the grand jurors' lunch recess and their vote. Court reporters estimate that it takes about 30 pages of transcript to record a discussion of half an hour. Therefore, we deduce that the grand jury probably voted on whether to return the indictment after 3:30 p.m. on September 14, 1995.

evidence.[47] <u>Bank of Nova Scotia v. United States</u>, 487 U.S. 250, 256, 108 S. Ct.

2369, 2374, 101 L. Ed. 2d 228 (1988) (quoting <u>United States v. Mechanik</u>, 475

U.S. 66, 78, 106 S. Ct. 938, 945-46, 89 L. Ed. 2d 50 (1986)).  In answering this

question, our task is to examine the state of mind of the grand jurors.[48]  As

discussed <u>supra</u> Part II.C, our only source of evidence to find the ultimate

constitutional fact – whether the grand jury was overborne – is the cold record of

the grand jury proceedings.  Specifically, we draw inferences from the words

AUSA Rubinstein used, the testimony of witnesses who appeared before the grand

jury, and the grand juror's questions.[49]

---

[47] The <u>Bank of Nova Scotia</u> inquiry is written in the disjunctive; we may dismiss the indictment if we find either that the grand jury was substantially influenced <u>or</u> if there is grave doubt that the decision was not free from substantial influence.  The disjunctive test is derived from the harmless error analysis found in <u>Kotteakos v. United States</u>, 328 U.S. 750, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946), and <u>United States v. Lane</u>, 474 U.S. 438, 106 S. Ct. 725, 88 L. Ed. 2d 814 (1986).  Under this test, "grave doubt" means "that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise."  <u>O'Neal v. McAninch</u>, 513 U.S. 432, 435, 115 S. Ct. 992, 994, 130 L. Ed. 2d 947 (1995).

The <u>Bank of Nova Scotia</u> inquiry thus appears to mean that we may dismiss an indictment if the cold record shows that the grand jury's decision was substantially influenced by improper evidence or if the record is in equipoise on the issue.  While we question whether the higher standard subsumes the lower standard (i.e., if the evidence yields the conclusion that the grand jury was substantially influenced, it will always satisfy the "grave doubt" test, but the converse is not true), we need not address that issue here.  We find that the grand jury's decision was substantially influenced by improper evidence, which necessarily leaves us in grave doubt (indeed, more than grave doubt) that the decision to indict was free from the substantial influence of such evidence.

[48] In making this determination, we consider the state of mind of the reasonable grand juror.

[49] On rehearing, the Government cites <u>United States v. Williams</u>, 504 U.S. 36, 112 S. Ct. 1735, 118 L. Ed. 2d 352 (1992), for the proposition that we do not have the authority to prescribe

1.

We begin our inquiry by considering what the grand jurors must have been thinking on the first day of the proceedings, September 13, 1995, when Rubinstein announced that he would be asking the grand jury to vote on an indictment the very next day. The announcement must have caused many of the grand jurors to question – at least silently – whether they could, in good conscience and in conformance with their oaths as grand jurors, render a twenty-one page, multi-count indictment against multiple defendants in less than two days.[50]

standards of conduct for a government attorney in the grand jury setting. As described <u>supra</u> note 41, the Supreme Court has not yet clarified what remains of the court's supervisory power under such circumstances. In any event, we stress that in undertaking this analysis, we are not censuring any specific conduct outlined <u>supra</u> Part III.B. Rather, we consider only whether the <u>totality of the circumstances</u> so overbore the grand jury that the indictment was not, in fact, that of an independent grand jury.

[50] Any grand juror's doubt about the propriety of rendering an indictment in only two days was likely assuaged by the typical grand jury charge, given to grand jurors at the outset of their service:

> Assistant United States Attorneys will provide you with important service in helping you to find your way when confronted with complex legal matters. It is entirely proper that you should receive this assistance. If past experience is any indication of what to expect in the future, then you can expect candor, honesty and good faith in matters presented by the government attorneys.

Federal Judicial Center, Bench Book for United States District Court Judges § 3.02 at 13 (3d ed. 1986). While grand jurors are told that they must use their "own independent judgment" in determining the credibility of witnesses and deciding whether to indict, <u>id.</u> at 10, 14, they infer from the charge that it is proper to rely on the AUSA to guide them through the procedures for returning an indictment. A reasonable grand juror in the instant case would therefore infer that it is proper to indict in two days based on a summary of evidence because Rubinstein would not have asked the grand jury to do so if it were improper.

The record in this case does not contain a grand jury charge and a court is not required to charge the grand jury. We may presume that this grand jury was charged, however, because the jurors would not otherwise have known how many votes are necessary to return an indictment or

The grand jury initially heard that two prior grand juries had already considered the case. The first grand jury indicted only the president of the company,[51] and the second grand jury, after hearing a significant amount of testimony and reviewing documents over the course of a year, did not return an indictment. This information must have caused the grand jurors to wonder why the second grand jury had not returned an indictment after studying the matter extensively. With only these facts, the grand jurors no doubt believed that they were being asked effectively to "overrule" the second grand jury's considered judgment on the case after only a two day proceeding in which they would receive merely a summary of the same evidence.

The jurors' concerns were probably assuaged, however, when Rubinstein suggested that their predecessors wanted to indict. They were told that the second grand jury was very "unhappy" that it was not given an opportunity to vote on the

---

any other grand jury procedures; the transcripts reveal that Rubinstein did not explain the procedures to the grand jury.

[51] Rubinstein actually made little mention of the first grand jury. In introducing the superseding indictment on the first day, he told the grand jury:
> [Y]ou'll notice it's called a superseding indictment. And what that means is that there was another indictment related to this case that's already been returned by a different Grand Jury. And one of the people who is on this list of defendants is already under indictment, and this case is basically an expansion of the indictment against that one individual . . . . The investigation got started in 1992 . . . nothing much happened . . . . A few witnesses were called to the Grand Jury, but it didn't develop very far.

indictment. Rubinstein stated that the second grand jury had "spent a lot of work" on the case, hearing witnesses and examining exhibits, but he had to tell the second grand jury that because of "an administrative situation," it could not vote. Rubinstein further relayed that when the second grand jury was told that it would not get a chance to vote, "they all said, oh, I'm so sorry."

If the grand jurors accepted Rubinstein's assurances, they would have inferred that the second grand jury, which spent considerable time investigating the alleged crime, would have indicted but for the "administrative situation."[52]   This undoubtedly helped put the jurors' minds at ease about the existence of probable

---

[52] Rubinstein repeated this story in response to a question from one of the grand jurors. The juror asked: "Early on in your presentation you mentioned something about the previous Grand Jury having a problem with this case?"

> Rubinstein:  No.  The problem that they had was that they wanted to vote on it.  They wanted to be in a position to hear the evidence and decide, just as you're being asked to do, since they'd heard it for months.  They'd heard these witnesses and they were interested in it and they were following it very avidly.  And then I came to them and I said, I'm sorry, you're not going to get a chance to vote on this case because of an administrative situation in my office with the travel budget basically.  So until we resolve that, I don't have time.  And they all said, oh, I'm so sorry, good-bye, and now I'm presenting it to a new grand jury.  That's what I said.  That's what I meant to convey to you.

While Rubinstein never explicitly stated that the second grand jury was going to vote to indict, that is the necessary inference.  The jurors knew that the second grand jury "wanted to vote on [the indictment]."  The only possible inferences were that the second grand jury wanted to vote to indict or vote not to indict.  Consider which is more likely:  The reason Rubinstein did not ask the second grand jury to vote to indict was that it ran out of time.  The jury ran out of time because Rubinstein could not get authorization to take the deposition of Makkar in India.  Why would the grand jury have wanted to vote not to indict when there was more evidence to hear? The more likely inference, and the inference the grand jurors no doubt drew, is that the second grand jury had heard enough and wanted to vote to indict.

63

cause. After hearing the story about the second grand jury's desire to indict, it would in fact have been difficult for the third grand jury not to indict. If the grand jury decided not to indict, it would effectively be rejecting the second grand jury's finding of probable cause, despite the second grand jury's superior knowledge of the case. A reasonable grand juror would be hard-pressed to justify such a rejection based on less than two days of summarized evidence.[53]

The significant pressure put upon the third grand jury to "rubber stamp" the indictment out of deference to the second grand jury was improper. Indeed, the third grand jury never should have heard that the second grand jury wanted to vote to indict because the Federal Rules of Criminal Procedure prohibit the disclosure of grand jury deliberations. Rule 6(e)(2) is the general rule of grand jury secrecy which prohibits attorneys for the government from disclosing matters occurring before the grand jury.[54] Rule 6(e)(3) provides exceptions to the Rule. One such

---

[53] The only other logical inferences from a decision by the third grand jury not to indict would have been: (1) they did not believe Rubinstein's statement that the second grand jury was going to indict, and Rubinstein had not demonstrated probable cause, or (2) they did not believe Rubinstein's implicit statement that it was consistent with their duty as grand jurors to indict in two days without having heard all the testimony and reviewed the documents themselves. It is unlikely that the grand jurors would believe any of these possibilities, which would leave them with only one conclusion – they must indict. In fact, even if Rubinstein made an unconvincing presentation to the third grand jury, the jurors would likely have thought that Rubinstein must have fumbled, and the grand jurors would still have relied on the second grand jury's (implied) finding of probable cause.

[54] Fed. R. Crim. P. 6(e)(2) states, in pertinent part: "[A]n attorney for the government . . . shall not disclose maters occurring before the grand jury, except as otherwise provided for in

exception is that an attorney for the government may disclose matters occurring before one grand jury to another federal grand jury.[55]  Hence, Rubinstein's use of evidence presented to the first two grand juries and his disclosure to the third grand jury that two previous grand juries had considered the case was proper.  Rule 6(e) does not, however, permit anyone to disclose grand jurors' deliberations or votes.  The grand jurors' deliberations and votes may not even be recorded under Rule 6(e)(1), which requires that all other grand jury proceedings be recorded.[56]  It stands to reason, then, that an attorney for the government may not publish prior grand jury deliberations in the record before another grand jury.

Suggesting to the third grand jury that the second grand jury wanted to indict was tantamount to disclosing grand jury deliberations.  Such a disclosure is prohibited by Rule 6(e) because, among other reasons, such knowledge prevents the grand jury from making an <u>independent</u> finding of probable cause.  The information about the second grand jury's leanings, therefore, should not have been presented to the grand jury for consideration.

these rules."

[55] Fed. R. Crim. P. 6(e)(3)(C) states, in pertinent part: "Disclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made . . . . (iii) when the disclosure is made by an attorney for the government to another federal grand jury . . . ."

[56] Fed. R. Crim. P. 6(e)(1) states, in pertinent part: "All proceedings, except when the grand jury is deliberating or voting, shall be recorded stenographically or by an electronic recording device."

The grand jurors were no doubt predisposed to indict after hearing that the second grand jury, after considering all of the evidence, wanted to indict. Regardless, any lingering doubt the grand jurors may have had about their ability to find probable cause in only two days was most likely alleviated by information about other crimes the defendants had allegedly committed.[57]  Rubinstein told the jurors that the Government was going to send the FDA lab some shrimp that may have been exposed to the chlorine that Sigma used to clean the pre-packing trays. The obvious inference to be drawn from this was that the defendants had engaged in more criminal activity than that alleged in the indictment.  Rubinstein also told the jurors that Sternisha "lied" to the first grand jury,[58] even though he had not been charged with perjury.  Rubinstein added, "that's why I think he's a good prospect to get indicted."  Finally, just before asking the grand jury to indict, Rubinstein told the jurors that Sigma's sales representatives were all quitting

---

[57] While he was explaining to the grand jury the "administrative situation" that precluded the second grand jury from voting on an indictment, Rubinstein said, "we've already charged people with a bunch of crimes."  He did not say who had been charged, but a reasonable grand juror could have concluded that those charged included one or more of those named in the indictment before them.  Rubinstein did not specify what the "bunch of crimes" were.

[58] Rubinstein did not specifically state that Sternisha lied before the first grand jury.  The jurors likely inferred as much, however, from the fact that the false testimony was allegedly given in 1993.  The grand jurors knew that a total of three grand juries, including themselves, had considered the case.  They were told that the previous (second) grand jury went out of existence sometime in August, 1995, after considering the case for a year (August 1994 – August 1995).  The grand jurors could thus infer that the 1993 testimony, in which Sternisha allegedly lied, must have been before the first grand jury.

because they were being forced to sell bad shrimp and their customers were beginning to hate them for it.

Derogatory statements about the character of a defendant or statements about other crimes a defendant may have committed are improper because they have a tendency to inflame the grand jury – thereby infringing on the grand jury's obligation to find probable cause based on competent evidence. See Sara Sun Beale & William C. Bryson, Grand Jury Law and Practice § 10.02 (1986); see also United States v. Hogan, 712 F.2d 757, 760-61 (2d Cir. 1983). The jurors could be expected to infer from the comments above that the defendants were bad people – even Sigma's own employees thought the defendants were guilty. The jurors might therefore have been more inclined to believe that they could, in good conscience, indict the defendants without reviewing all of the evidence.

Making matters worse, the excerpts quoted in Part III.B, supra, demonstrate that the grand jury heard considerable informal unsworn testimony from Rubinstein. Such testimony from an AUSA is generally disfavored because it has a tendency to "unduly influence the grand jury." Sara Sun Beale & William C. Bryson, Grand Jury Law and Practice § 10.04 (1986); see also United States v. Birdman, 602 F.2d 547, 551 (3d Cir. 1979) ("[W]e condemn in principle this practice of serving as both prosecutor and witness."). The grand jurors would be

67

prone to accept the AUSA's testimony without question both because of his professional expertise, see Birdman, 602 F.2d at 553, and because of the charge the jurors receive before they serve.[59]  Recall that the grand jurors are told by the judge that "[i]f past experience is any indication of what to expect in the future, then you can expect candor, honesty and good faith in matters presented by the government attorneys."[60]  An AUSA testifying informally and unsworn to a grand jury therefore has the potential of overbearing the grand jury.  Consistent with the reasons a prosecutor's unsworn testimony is disfavored, the ABA Model Rules of Professional Conduct prohibit any lawyer, including a prosecutor, from working as an advocate in a case in which the lawyer will likely be called as a material witness.  ABA Model Rules of Professional Conduct, Rule 3.7; see Birdman, 602 F.2d at 552; see also United States v. Hodge, 496 F.2d 87, 88 (5th Cir. 1974)

---

[59] See supra note 50.

[60] Federal Judicial Center, Bench Book for United States District Court Judges § 3.02 at 13-14 (3d ed. 1986).  All of Rubinstein's unsworn statements to the grand jury were further buttressed by Agent Siberski's testimony about Rubinstein's honesty.  Siberski, vouching for Rubinstein on the witness stand, stated that Rubinstein "as an Assistant U.S. Attorney is probably one of the most insistent on this as I've ever seen, be fair, be objective, let's get to the truth and let's be as fair as we can to everybody involved."  The inference the jurors undoubtedly drew is obvious: the agent, a neutral party, thinks that Rubinstein is a man with integrity; therefore, Rubinstein is trustworthy.

(holding that an indictment may not be based solely on the informal unsworn testimony of a government attorney).[61]

2.

The substantial amount of information improperly presented to the grand jury does not, per se, warrant a dismissal of the indictment. Rather, we must determine whether, in the context of everything that transpired before the grand jury, the improper evidence "substantially influenced the grand jury's decision to indict." Bank of Nova Scotia, 487 U.S. at 256, 108 S. Ct. at 2374 (internal quotations omitted). To make this determination, we must consider the surrounding circumstances.

The third grand jury had less than two days to consider the twenty-one page, twelve count indictment against multiple defendants. For nearly half that time, the grand jury merely heard Rubinstein informally testify and comment on evidence.[62] During the rest of the time, the grand jury heard testimony from two FDA case agents and one supervisor with the Florida Department of Agriculture. These

---

[61] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[62] On 210 of the 487 pages of the transcript from the grand jury proceeding, Rubinstein commented directly to the grand jury, either in response to a grand juror's question, as prompted by a witness's response to a question, or simply on his own initiative.

witnesses provided summaries of testimony given before the first and second grand juries, at times reading verbatim transcripts of testimony from witnesses who did not appear before the third grand jury.

Keeping in mind that the second grand jury did not indict after considering extensive evidence and hearing from a number of witnesses, we query whether the third grand jury would have indicted absent the evidence improperly presented to it. We need not resolve that question, however; we need only determine, as we do, that the decision to indict was substantially influenced by improper evidence.

We note that Rubinstein was careful to tell the grand jurors at the conclusion of the proceeding that if they needed more time, or wanted to review the exhibits and testimony presented to the second grand jury, they were certainly entitled to do so. Given the circumstances, however, the likelihood that any one grand juror would have requested additional time to review the multitude of exhibits, documents, and testimony presented over the course of the preceding year was negligible. Any juror who made this request would, in effect, be accusing Rubinstein of some sort of malfeasance. The grand juror would either be implying (1) that he did not believe Rubinstein's suggestion that the second grand jury wanted to indict, or (2) that rendering an indictment without reviewing all of the

evidence was <u>not</u>, contrary to Rubinstein's implication, consistent with the grand

jury's duty to indict based on probable cause.[63]

Rubinstein's offer, therefore, was entirely illusory. It was little more than a

last ditch effort to assuage the jurors' consciences and encourage them to indict.[64]

---

[63] The grand juror who wished to request additional time to review all of the documents faced additional adverse pressures. First, the juror's request would likely have been interpreted as an impudent suggestion that the juror knew more than the AUSA about the proper functioning of a grand jury. Second, the juror's request would have created a great deal of work for the Government, which would incur costs in reproducing the documents and transcripts of testimony. Third, the juror's request would have delayed the grand jury's work and put pressure on the other members of the grand jury to review the documents and testimony. The grand juror who wanted additional time and evidence, then, had to weigh that desire against the odds of becoming a pariah within the group.

While the record does not reflect the exact number of grand jurors that were present on either day the grand jury considered the indictment, it must have been between 16 (the minimum required for a quorum) and 23 (the maximum allowed on a grand jury). <u>See</u> 18 U.S.C. § 3321. For an indictment to issue, 12 grand jurors must vote to indict. Fed. R. Crim. P. 6(f). Any grand juror who had doubts about voting to indict and wanted the additional information, therefore, would have known that he had to convince between five (if 16 jurors were present) and 12 (if 23 jurors were present) not to vote to indict until having reviewed all of the evidence not yet reproduced. The more jurors present, the more daunting his task and the less likely he would make the request.

Further, there was a group dynamic at issue dissuading each juror from requesting additional time to review the evidence. Any grand juror who may have felt uncomfortable with the lack of information presented may have believed himself to be the only one who was uncomfortable – even if every juror was feeling the same way. Each juror may have misinterpreted the silence of other jurors, erroneously assuming that the other jurors had heard enough to find probable cause. This is the well-established psychological theory known as "pluralistic ignorance." <u>See generally</u> Dale T. Miller and Cathy McFarland, <u>When Social Comparison Goes Awry: The Case of Pluralistic Ignorance</u> in Social Comparison: Contemporary Theory and Research, 287-313 (J. Suls & T.A. Wills eds. 1991).

[64] Alternatively, the offer may have been made in contemplation of judicial review of the grand jury proceedings. As set forth in Part I.C, <u>supra</u>, Rubinstein, in his January 8, 1996 response to Sigma's motion for <u>in camera</u> review of the grand jury transcripts, stated that "the full transcripts, and documentary evidence [were] continuously available in the jury room, and [he] urged the jurors to read such transcripts." We now know that the transcripts were <u>not</u> available in the jury room (or at least Rubinstein told the grand jurors they were not), and that

71

Given the circumstances, it is unreasonable to assume that any of the grand jurors would have requested additional time to review further evidence.

3.

After an exhaustive review of the complete grand jury transcripts on rehearing, we are convinced that the record requires one result: dismissal of the indictment. We find that the improperly introduced evidence "substantially influenced the grand jury's decision to indict," Bank of Nova Scotia, 487 U.S. at 256, 108 S. Ct. at 2374 (internal quotation omitted), and therefore hold that the appellants were deprived of "an investigative body acting independently of either prosecuting attorney or judge," Williams, 504 U.S. at 49, 112 S. Ct. at 1743 (internal quotation and emphasis omitted).

IV.

Rubinstein's offer to procure them, under the circumstances, was transparently insincere. In his September 10, 1996 response to Sigma's motion to dismiss the indictment, Rubinstein backed off his assertion that he urged the grand jurors to review the transcripts, stating only that "[i]n the present case, it is clear from the transcript that the grand jury was free to ask questions, request additional testimony, and review documentary evidence."

Regardless of whether Rubinstein's offer to reproduce the documents and transcripts was made to assuage the jurors' consciences or to satisfy a reviewing court, its spurious nature renders it devoid of any probative value.

For the foregoing reasons, we REVERSE the appellants' convictions and direct the district court to DISMISS the indictment.

SO ORDERED.